596 A.2d 1221

Vernon F. WALTMAN, Evelyn M. Waltman, Leonard I. Hurwitz, Matthew T. Hawkins, Mildred J. Hawkins, Ellen Andrew Flemma and Glenn E. Campbell, Petitioners,

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued May 1, 1991.

Decided Aug. 15, 1991.

As Clarified Sept. 24, 1991.

Petition for Allowance of Appeal Granted Jan. 7, 1992.

46

Louis B. Loughren, for petitioners.

Alan Kohler, Asst. Counsel, for respondent.

Lewis S. Kunkel, Jr., for intervenors.

Before CRAIG, President Judge, and COLINS, PALLADINO, McGINLEY, SMITH, PELLEGRINI and KELLEY, JJ.

CRAIG, President Judge.

Petitioners Vernon F. Waltman, et al., have appealed to this court from an order of the Pennsylvania Public Utility Commission granting the applications of WTG–Central and WTG–East for certificates of public convenience. We affirm the commission's decision.

WTG–Central and WTG–East filed separate applications with the Pennsylvania Public Utility Commission for certificates of public convenience and necessity to offer intrastate telecommunications services in Pennsylvania.[1] On August 25, 1989, the petitioners filed protests to the applications with the commission. On June 18, 1990, the commission

1. WTG–Central filed its application on June 26, 1989, and WTG–East filed its application on July 20, 1989. For purposes of this discussion, WTG–Central and WTG–East will be collectively referred to as the applicants.

granted the applicants certificates of public convenience and necessity.

On July 17, 1990, the petitioners filed a petition for review with this court. The applicants and commission filed a joint motion to quash the petition for review or, in the alternative, to strike certain objections raised in the petition. On November 26, 1990, Judge Kelley of this court denied the motion to quash and granted the motion to strike in part.

Judge Kelley had concluded that several of the objections concerned an issue of whether the commission had jurisdiction over "resellers." [2] However, the commission here has treated applicants and their parent, Williams Telecommunications Group, Inc., as a group constituting a facilities-based carrier.

■ Our scope of review in matters involving certificates of public convenience is limited to a determination of whether the commission committed an error of law, whether substantial evidence exists to support its findings or whether constitutional violations were committed. *Limelight Limousine, Inc. v. Pennsylvania Public Utility Commission*, 131 Pa.Commonwealth Ct. 522, 570 A.2d 1378 (1990). See also, *Society Hill Carriage Co. v. Pennsylvania Public Utility Commission*, 135 Pa.Commonwealth Ct. 538, 581 A.2d 702 (1990).

1.

■ The petitioners argue that the commission committed an error of law by misapplying the legal standard for determining whether the applicants' services are for the public and hence concluding that the applicants are public utilities subject to the commission's jurisdiction.

According to the petitioners, because the applicants' utility services will be used primarily by individual commercial

2. Resellers are companies which lease the use of line, wire or cable from a facilities-based carrier and resell the service to third parties. In other words, a reseller purchases long distance service in bulk and resells that service to others on a retail basis.

entities and other common carriers, the applicants' offer to serve does not constitute an offer to serve the public at large and therefore, the service does not fall within the definition of public utility.

The relevant starting point for analysis is section 102 of the Code, 66 Pa.C.S. § 102, which defines "public utilities" as including

> any person or corporations [sic] now or hereafter owning or operating in this Commonwealth equipment or facilities for ... [c]onveying or transmitting messages or communications by telephone or telegraph ... *for the public* for compensation. (emphasis added.)

According to our Supreme Court, the test for determining whether utility services are being offered "for the public" is

> whether or not such person holds himself out, expressly or impliedly, as engaged in the business of supplying his product or service to the public, as a class, or *to any limited portion of it,* as contradistinguished from holding himself out as serving or ready to serve only particular individuals.

*Drexelbrook v. Pennsylvania Public Utility Commission,* 418 Pa. 430, 435–36, 212 A.2d 237, 239 (1965) (emphasis added).

The commission reasoned that there are two factors which are relevant in determining whether a utility service is for the public. These include: (1) whether the service at issue is merely incidental to the service provider's non-utility business relationship with its customers, e.g., *Drexelbrook, supra* (a landlord supplying utility service only to his tenants is not a public utility); and (2) whether the utility facility was designed and constructed only to serve specific individuals so that the resulting service is not properly considered to be for the public, e.g., *Borough of Ambridge v. Pennsylvania Public Service Commission,* 108 Pa.Superior Ct. 298, 165 A. 47 (1933).

Furthermore, the private or public character of a business does not depend upon the number of persons who actually use the service; rather, the proper characterization rests upon whether or not the service is available to all members of the public who may require the service. *C.E. Dunmire Gas Co., Inc. v. Pennsylvania Public Utility Commission*, 50 Pa.Commonwealth Ct. 600, 413 A.2d 473 (1980). The fact that only a limited number of persons may have occasion to use a utility's service does not make it a private undertaking if the general public has a right to subscribe to such a service. *Masgai v. Pennsylvania Public Service Commission*, 124 Pa.Superior Ct. 370, 188 A. 599 (1936); *Borough of Ambridge, supra.*

The petitioners argue that the commission erred in considering the "design and construction" of the applicants' facilities and that the commission should consider only the actual service the applicants provide to determine whether it is for the public.

Although the nature of the actual service, rather than the design or construction characteristics of the facilities, is the pivotal element that determines the provider's status as private or public, *Borough of Ambridge, id.*, the applicant has not yet started providing intrastate service in Pennsylvania. Hence, the commission, in accordance with *Borough of Ambridge,* looked to the design and construction of the applicant's facilities to determine the character of the service and whether the service will be for the public or only for a group of particular individuals.

The commission properly considered the factors described above in addressing the controlling question of whether the applicants' service will be offered to the public and not held out to particular individuals.

The commission concluded that:

It is true that applicants' services are only economically feasible to entities which desire large volumes of business. However, it is clear that this is not a determinative factor in reviewing the issue of whether the service is to the public....

. . . .

In view of the relevant case law and our present regulatory policies, it is clear that applicants' proposed service is to the public or a limited portion thereof. . . . *Most importantly, the applicants' services will be offered to the public and are not held out only to particular individuals.* Accordingly, applicants' proposed services fall within jurisdictional limits of 66 Pa.C.S. § 102.

Opinion dated June 18, 1990, at 15 (emphasis added).

The commission applied the proper test, as formulated by our Supreme Court in *Drexelbrook*, to determine whether the applicants are public utilities. In addition, the commission's application of the test and interpretation of section 102 of the Code, 66 Pa.C.S. § 102, is consistent with its present policy of regulating other bulk utility services, including gas transportation and WATS long distance service, even though large volume customers are generally the only users of those services.

## 2.

█ The petitioners also argue that substantial evidence does not support the commission's finding that the applicants' services are "for the public".

In this case, the applicants have indicated that service will not be provided to only certain groups or individuals. The fact that the record indicates that only a small portion of the public will have reason to use the applicants' services is not controlling. Significantly, the record supports the commission's finding that the applicants offer their services to *any* person or company that elects to subscribe to their services.

The record also reveals that the applicants' facilities were not designed or constructed to serve select groups of individuals, but are intended for any member of the public which can use their services.

The applicants concede and the commission acknowledged that large volume users, including commercial entities and other common carriers, will probably be the only entities

able to utilize the applicants' services. Although those businesses comprise a limited portion of the public, nothing in the record suggests that the applicants will limit their services to a select group of individuals. Rather, the record shows that the applicants' services are available to *any* prospective customer who has a need for and requests them. Hence, substantial evidence supports the commission's pertinent factual findings.

3.

The petitioners also argue that the commission erred in determining that the granting of certificates of public convenience to the applicants was necessary or proper for the service, accommodation, convenience or safety of the public, as required by section 1103(a) of the Code, 66 Pa.C.S. § 1103(a).

 In determining whether an application for a certificate of public convenience to provide competitive telecommunications should be granted, the commission considers:

1. Whether the applicant possesses the technical and financial capability to provide the service proposed; and

2. Whether there is a 'public need' for the proposed service.[3]

*In re Implementation of Intrastate Access Charges,* 58 Pa. PUC 239.

The petitioners do not question the applicants' technical and financial capability to provide the proposed service, but

**3.** This court has approved a three-pronged test used by the commission to determine whether to grant certificates of public convenience to utilities. In addition to the two prongs identified in *Intrastate Access,* the third prong requires the commission to determine whether the existing service is inadequate.

However, the commission eliminated the third prong with respect to providers of telecommunication services in an effort to foster competition between companies. The propriety of permitting competition in any particular field is largely an administrative question to be decided by the commission in the exercise of its discretion. *Reeder v. Pennsylvania Public Utility Commission,* 192 Pa.Superior Ct. 298, 162 A.2d 231 (1960). Accordingly, we will not disturb the commission's decision to eliminate the third prong of the test.

argue that there is no substantial evidence to support a finding of "public need" for the service.

■ However, the evidence was sufficient to satisfy the public-need prong of the test. The record reveals that (1) the applicant provides its service at competitive rates, R. 147a–149a; (2) the applicants' reselling of its service to other carriers allows them to provide lower cost service to commercial and residential customers, R. 148a; and (3) the applicants' private line service improves the reliability of governmental entities and financial institutions that use the service. R. 142a.

In addition, the record includes letters of support from three proposed customers indicating their desire to purchase intrastate services from the applicants. R. 231a–233a.

Finally, the commission noted that when the applicants' fiber optic system is fully integrated into the state's telephone network, the increased competition will result in improved quality and a reduction in costs of service. R. 5a, 141a–143a, 147a–149a.

The commission's findings with respect to the public need for the applicants' service are supported by substantial evidence and will not be disturbed.

### 4.

■ The petitioners also argue that the applicants will receive a competitive advantage over the Bell Operating Companies (BOCs), because certain federal restrictions apply to BOCs but not to the applicants. However, the presence and application of those federal restrictions is irrelevant to our determination because that factor is beyond our limited scope of review, which is confined to an examination of the commission's findings relating to public need.

The petitioners ask this court to "bring Pennsylvania out of the dark ages of regulation, to follow the enlightened path of deregulation." Of course, this court is not empowered to engage in judicial legislation, which in essence is

what the petitioners request. We have reviewed the record and must conclude that the applicants are public utilities under the definition provided in section 102 of the Code, 66 Pa.C.S. § 102.

In summary, the commission has not committed an error of law and its findings with respect to both the question of public need and the certificate of public convenience are supported by substantial evidence. Thus, the commission properly granted the applicants certificates of public need and convenience because they are offering a public utility service within the Commonwealth of Pennsylvania. Accordingly, the commission's opinion and order entered June 18, 1990, is affirmed.

## ORDER

Now, August 15, 1991, the order of the Pennsylvania Public Utility Commission, at Docket Nos. M–840401, L–900054, A–310000 and A–310001, dated June 18, 1990, is affirmed.

BYER, J., did not participate in the decision of this case.

PELLEGRINI, Judge, dissenting.

I dissent. I do not believe that WTG's proposed point-to-point offering of dedicated lines to resellers, large commercial users,[1] interexchange carriers and governmental entities is providing telecommunication service "for the public" within the meaning of 66 Pa.C.S. § 102.[2]

---

**1.** Some of the commercial users are "aggregators." An aggregator is a commercial entity, typically a hospital, university, hotel or motel, which has telephones routinely available for transient users—their customers, patrons or other general public. (PUC Order, entered June 19, 1990, pp. 11–20).

**2.** The definition of a "public utility" contained in 66 Pa.C.S. § 102 provides in relevant part:

"Public Utility."

WTG–East and WTG–Central are subdivisions of Williams Telecommunications, Inc. (WTG). WTG made an application to the Pennsylvania Public Utility Commission to provide lines from its point of presence (POP) in Philadelphia to or from its POP in Pittsburgh. A POP is where a call can enter or leave a telephone system, i.e., the system that provides dial tone service to each customer so he can receive the transmission no matter where it originates or over whose "long" distance or "inter systems transfer lines" the call is transported. (PUC Order, p. 11.)

In Findings of Fact Nos. 5 and 6 regarding WTG's application, the Pennsylvania Public Utility Commission found the following (PUC Order, p. 12):

5. Applicants currently provide "point-to-point" or "private line" interstate telecommunications service to their customers. Both voice and data communications are transmitted over the WTG systems. *"Private line" service is the term used to describe service through a dedicated link or line reserved only for one customer as opposed to the traditional switched service where lines are not dedicated but used to transport calls for any customer as needed. From a practical point of view, because private line service involves assignment of a line to a customer, only entities which send or receive a large volume of communications between two specific points will find the service attractive economically. Generally, the customers who subscribe to private line service are resellers, certificated interexchange carriers, governmental entities and commercial entities.* These are also WTG's typical customers on an interstate basis.

(1) Any person or corporation now or hereafter owning or operating in this Commonwealth equipment of facilities for:

 \* \* \* \* \* \*

(vi) Conveying or transmitting messages or communications by telephone or telegraph or domestic public land mobile radio service including, but not limited to, point-to-point microwave radio service *for the public* for compensation. (Emphasis added.)

6. All of the major certificated interexchange carriers provide private line service along with switched service pursuant to tariffs on file with the Commission. Unlike most of the other major certificated interexchange carriers, *WTG provides only private line service and does not provide switched service. Because private line service, in general, is frequently provided to other telecommunications carriers,* the designated lines are used to transmit calls for all types of residential and business telephone service through integration with the switched service system.... (Emphasis added.)

(PUC Order, p. 12.)

WTG's offering of leased lines primarily to resellers does not qualify as providing telecommunication services "for the public."

"The public or private character of the enterprise does not depend ... upon the number of persons by whom it is used, but upon whether it is open to the use and service of all members of the public who may require it." *Drexelbrook Associates v. Pennsylvania Public Utility Commission*, 418 Pa. 430, 435, 212 A.2d 237, 239 (1965). Whether a service is designed or constructed for the public is whether the service is designed or constructed for particular groups or whether it is being used by all segments of the public. *Borough of Ambridge v. Public Service Commission of Pennsylvania*, 108 Pa.Superior Ct. 298, 165 A. 47 (1933). To determine if a service is not being provided "for the public" but rather for private interests, the examination to be focused upon is how the service is operated. *Aronimink Transp. Co. v. Public Service Commission*, 111 Pa.Superior Ct. 414, 170 A. 375 (1934).

The PUC's own findings make it clear that WTG's proposed offering is to business entities who are primarily engaged in the business of reselling telecommunication services. When the General Assembly used the term "for the public", it did not intend that entrepreneurs engaging in competition with each other for business and with the ability to obtain lines from a number of other suppliers

were within the ambit of that phrase, nor did it envision that they needed protection afforded under the public utility laws. If anyone serves "the public," it is the resellers of these services who, in effect, lease lines at "wholesale" from WTG, then use that line to provide a "retail" service for the public.[3]

Accordingly, I would reverse the order of the PUC.

**3.** Resellers to the public are not considered "public utilities." In its order, the PUC held:
> Accordingly, for the first time, we will declare our jurisdictional limits over telephone carriers as established by Section 102 to include only those entities which hold legal title to line, wire or cable utilized to transmit messages from an origin point to a destination point; *thus placing resellers outside of our jurisdiction.* (Emphasis added.)

(PUC Order, p. 8.)