**PILOT TRAVEL CENTERS LLC, Petitioner**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 11, 2007.
Decided July 17, 2007.
Publication Ordered Oct. 18, 2007.

---

Paige Macdonald–Matthes, Harrisburg, for petitioner.

Stanley E. Brown, Asst. Counsel, Harrisburg, for respondent.

William T. Hawke and Steven K. Haas, Harrisburg, for intervenor, Jai–Mai, Inc.

BEFORE: SMITH–RIBNER, Judge, SIMPSON, Judge, AND McCLOSKEY, Senior Judge.

OPINION BY Senior Judge McCLOSKEY.

Pilot Travel Centers LLC (Petitioner) petitions for review of the opinion and order of the Pennsylvania Public Utility Commission (PUC) entered on November 30, 2006, which reversed a previous opinion and order and concluded that Jai–Mai, Inc. (Jai–Mai), was not a public utility subject to its regulation. We now affirm.

In 1988, Mahesh Trivedi (Trivedi), on behalf of Copper Mountain, Inc., applied for subdivision and land development approval for the construction of a motel with a restaurant near the intersection of Interstate 80 and Route 93 in Sugarloaf Township, Luzerne County, Pennsylvania.[1] As

---

1. Trivedi was president of Copper Mountain, Inc.

of the date that Trivedi filed his application, the Township had no public sewer service in that area nor any long range plans for such service in the future. Thus, as part of the application process, Trivedi applied for an "Act 537 Planning Module Amendment" to build his own sewage treatment facility which would serve the motel and restaurant at approximately 17,000 gallons per day of sewage flow.

The Township passed a resolution finding that although the proposed subdivision and method of sewage disposal did not conform to and was not included in the Township's "Official Plan," the proposal did conform to a comprehensive program of pollution control and water quality management. The Township thereafter forwarded its resolution, together with the planning modules for the proposed sewage treatment plant to the Department of Environmental Resources (now the Department of Environmental Protection or DEP) for final review and approval. In April of 1989, DEP rejected the planning module because the submission failed to address the sewage disposal needs in that area of the Township. DEP noted the need for long range development of a sewage treatment plan for that area.

In 1989, Trivedi filed another application for an "Act 537 Planning Module Amendment." In this application, Trivedi increased the capacity of his proposed sewage treatment plant to 25,000 gallons per day in order to accommodate any additional sewage needs in that area of the Township. In a letter to DEP, Trivedi noted that he would be acceptable to a condition requiring that he allow outside users to tie into the sewage plant as long as they agree to bear the cost of connection to the plant as well as monthly operation and maintenance costs. In June of 1989, DEP approved Trivedi's application and designated his proposed plant as an interim regional treatment facility to allow for future joint use to handle both present and future short term needs in that area of the Township. Also in 1989, Trivedi applied for and was granted a National Pollutant Discharge Elimination System (NPDES) Permit, permitting him to discharge effluent related to his sewage treatment facility.

On August 1, 1991, Trivedi, on behalf of Copper Mountain, Inc., and Petitioner entered into an agreement whereby Petitioner paid Trivedi $120,000.00 for the right to connect to and use the sewage treatment plant. Simultaneously, the parties executed a second operating agreement whereby Petitioner agreed to pay Trivedi a monthly fee to cover the operating and maintenance costs related to the plant. In 1993, Trivedi filed for bankruptcy. As a result of a subsequent mortgage foreclosure, Hazleton National Bank (the Bank) briefly took over ownership and operation of the motel and sewage treatment plant.[2] In 1993, the Bank conveyed the motel and plant to D.C. East, Inc., and assigned the agreements with Petitioner and Melrose Realty to D.C. East, Inc., as well. In August of 2001, the NPDES Permit was renewed and issued to D.C. East, Inc.

One year later, in August of 2002, D.C. East, Inc., conveyed the motel and sewage treatment plant to Jai–Ambe, Inc., and Drums Motel, LLC, both of which are owned by the same individuals. Jai–Ambe, Inc., had actually been operating the sewage treatment plant and collecting

---

**2.** During this time, the Bank entered into an agreement with Melrose Realty, the owner of an adjacent Texaco service station, permitting the service station to connect to and use the sewage treatment plant. Similar to Trivedi and Petitioner, the Bank and Melrose Realty also executed an operating agreement whereby the latter paid a monthly fee for operational and maintenance costs.

monthly fees on behalf of D.C. East, Inc., since May of 1998. In October of 2002, the NPDES Permit was transferred to Jai–Mai, which operates the sewage treatment plant pursuant to an oral agreement with Jai–Ambe, Inc., and Drums Motel, LLC.

Approximately two years earlier, in the beginning months of 2000, Petitioner's accounting department became aware of billing increases and irregularities in bills received at that time from Jai–Ambe, Inc. Petitioner initiated an investigation into these increases and irregularities. Petitioner, however, continued to remit the fees to Jai–Ambe and later to Jai–Mai. By letter dated March 7, 2001, Petitioner notified Jai–Ambe/Jai–Mai that its monthly invoices were not in accord with its original 1991 operating agreement and that it was paying under protest. In September of 2002, Jai–Mai notified Petitioner of its belief that it was not bound by the original 1991 operating agreement. Jai–Mai further advised Petitioner at that time of its intent to terminate Petitioner's sewage treatment service unless it agreed to pay what Petitioner characterized as a variety of unsubstantiated charges, including excess use fees. After Petitioner refused to pay these additional charges, Jai–Mai unilaterally terminated Petitioner's service on November 27, 2002.

In July of 2003, Petitioner filed a formal complaint with the PUC alleging that the sewage treatment facility run by Jai–Mai was a public utility operating without proper PUC authority. Additionally, Petitioner sought a refund of what it termed illegally collected rates by Jai–Mai for sewage treatment services. Jai–Mai filed an an-swer with new matter and the case proceeded with hearings before an administrative law judge (ALJ). Following these hearings, the ALJ issued an initial decision on October 12, 2004, recommending that Petitioner's complaint be sustained and that Jai–Mai be directed to file an application for certificate of public convenience with the PUC. Both parties filed exceptions to the ALJ's initial decision. Petitioner's exceptions were based upon the ALJ's failure to address its requested refund.

On January 12, 2006, the PUC voted unanimously to adopt the recommendation of the ALJ and find that Jai–Mai had been operating as a de facto public utility. In an opinion and order dated January 17, 2006, the PUC directed Jai–Mai to file an application for certificate of public convenience within thirty days. Further, in this opinion and order, the PUC remanded the issue of the refund of rates collected by Jai–Mai to the ALJ for adjudication. On January 26, 2006, Jai–Mai filed a motion for certification of the PUC's interlocutory order in order to permit it to seek review from this Court. The next day, Jai–Mai filed a petition for supersedeas with the PUC requesting a stay of its January 17, 2006, opinion and order. Approximately two months later, on April 4, 2006, the PUC issued an opinion and order requesting comments within thirty days as to the significance of the designation of the sewage treatment plant as an interim regional treatment plant, whether Jai–Mai held itself out to the public and whether Jai–Mai provided sewage treatment service to a defined, privileged and limited group.[3]

3. In its brief to this Court, Petitioner alleges that at a public meeting held on February 9, 2006, Vice Chairman James H. Cawley *sua sponte* presented a motion for reconsideration of the PUC's January 17, 2006, opinion and order based on his belief that the PUC might have erred in concluding that Jai–Mai was a public utility subject to PUC regulation. Nevertheless, the PUC's April 4, 2006, opinion and order did not reference this motion. Moreover, Section 331(a) of the Public Utility Code (the Code) provides that the PUC "may,

Petitioner, Jai–Mai and DEP all filed comments in response to the PUC's order on May 4, 2006. Subsequently, by opinion and order entered on November 30, 2006, the PUC reversed its previous opinion and order and concluded that Jai–Mai was not in fact a public utility. Nevertheless, despite this conclusion, in its order, the PUC directed Jai–Mai, as operator, as well as Jai–Ambe, Inc., and Drums Motel, LLC, as joint owners of the sewage treatment plant, to contact the PUC in writing prior to providing sewage treatment service for compensation to any additional customer.[4]

More specifically, in its November 30, 2006, opinion, the PUC concluded that neither Jai–Mai nor its predecessors ever held themselves out as willing to serve any and all members of the public. To the contrary, the PUC held that Jai–Mai and its predecessors provided service to the Texaco service station and Petitioner as a "defined privileged and limited group" under payment and contractual agreements that allowed them to control the service they provided. (Opinion of PUC, November 30, 2006, p. 17). Moreover, in its opinion, the PUC addressed a letter dated December 16, 2002, from Jai–Mai to the Township noting that the sewage treatment plant had "more than enough capacity to service additional residential customers." (R.R. at 977a). This letter was in response to a phone conversation between counsel for the parties wherein counsel for the Township indicated that his client was considering providing central sewer service to a residential development near Jai–Mai's sewage treatment plant. Nevertheless, the PUC held that a proposal to acquire a first customer or a defined, privileged and limited group of customers was permissible without incursion of public utility status. Petitioner thereafter filed a petition for review with this Court. Jai–Mai subsequently filed a notice of intervention.

■ On appeal,[5] Petitioner argues that the PUC's conclusions that Jai–Mai was not a public utility and that Jai–Mai only provided services to a defined, privileged and limited group were not supported by substantial evidence in the record. We disagree.

Section 102(1)(vii) of the Code defines "public utility" as "[a]ny person or corporations now or hereafter owning or operating in this Commonwealth equipment or facilities for ... (vii) [s]ewage collection, treatment, or disposal for the public for compensation." 66 Pa.C.S. § 102(1)(vii). Section 1101 of the Code requires a public utility to obtain a certificate of public convenience from the PUC before it can lawfully begin to provide public utility service. 66 Pa.C.S. § 1101. Jai–Mai does not dispute that it is a corporation operating equipment or facilities for sewage collection, treatment and disposal. Nor does Jai–Mai dispute that it receives compensation for the service it provides. The question in this case focuses on whether Jai–Mai operates this service "for the public."

---

on its own motion and whenever it may be necessary in the performance of its duties, investigate and examine the condition and management of any public utility or any other person or corporation subject to this part." 66 Pa.C.S. § 331(a).

4. In this same opinion and order, the PUC denied Jai–Mai's motion for certification of interlocutory order as well as its petition for supersedeas as moot.

5. Our scope of review of the PUC's decision is limited to determining whether the PUC committed an error of law, whether its findings are supported by substantial evidence and whether constitutional rights have been violated. *Susquehanna Area Regional Airport Authority v. Pennsylvania Public Utility Commission,* 911 A.2d 612 (Pa.Cmwlth.2006), *petition for allowance of appeal denied,* 592 Pa. 762, 923 A.2d 412 (2007).

In *Waltman v. Pennsylvania Public Utility Commission*, 142 Pa.Cmwlth. 44, 596 A.2d 1221, 1223 (1991), *affirmed*, 533 Pa. 304, 621 A.2d 994 (1993), we noted that our Supreme Court had previously explained the test for determining whether utility services are being offered "for the public" as follows:

> [W]hether or not such person holds himself out, expressly or impliedly, as engaged in the business of supplying his product or service to the public, as a class, or to any limited portion of it, as contradistinguished from holding himself out as serving or ready to serve only particular individuals. (Citations omitted.)

We also indicated in *Waltman* that "the private or public character of a business does not depend upon the number of persons who actually use the service; rather, the proper characterization rests upon whether or not the service is available to all members of the public who may require the service." *Id.* at 1224; *see also UGI Utilities, Inc. v. Pennsylvania Public Utility Commission*, 684 A.2d 225 (Pa.Cmwlth. 1996). Further, we stated in *Waltman* that "[t]he fact that only a limited number of persons may have occasion to use a utility's service does not make it a private undertaking if the general public has a right to subscribe to such a service." *Waltman*, 596 A.2d at 1224. However, service is generally private if the utility's customers constitute a defined, privileged and limited group. *See Drexelbrook Associates v. Pennsylvania Public Utility Commission*, 418 Pa. 430, 212 A.2d 237 (1965).

Nevertheless, in *Bethlehem Steel Corporation v. Pennsylvania Public Utility Commission*, 552 Pa. 134, 713 A.2d 1110 (1998), our Supreme Court noted its disagreement with our statements in *Waltman*. More specifically, the Court noted that the issue is whether the service is available to members of the public, recognizing that the public may be compromised only of commercial users. The Court further noted that in *Bethlehem Steel Corporation*, it was only dealing with a single end user and, by definition, a single user is not "the public." The Court proceeded to qualify this statement by indicating that if a utility only supplied one customer because it was unable to secure others, but it engaged in activity designed to secure others, it was possible that said utility could be found to be serving the public and, therefore, subject to the jurisdiction of the PUC. However, where the main activity which occurs is negotiation concerning the possibility of public utility activity, the Court in *Bethlehem Steel Corporation* held that a utility does not fall under the PUC's jurisdiction.

In the present case, the evidence of record reveals that Jai–Mai's predecessor, Trivedi, only intended the sewage treatment facility to service his proposed motel and restaurant. After DEP denied his first request for a planning module/sewage treatment facility, Trivedi submitted a second application increasing the capacity of this facility to address the future sewage disposal needs in that area as noted by DEP in the initial rejection letter. Trivedi thereafter agreed to comply with a condition imposed by DEP requiring him to permit outside users to connect to the facility. Nevertheless, neither Jai–Mai nor its predecessors ever solicited the public to connect to the facility. To the contrary, the service provided by Jai–Mai and its predecessors was only ever provided to a defined, privileged and limited group. This group only included two neighboring businesses, Petitioner and the Texaco service station, pursuant to private contractual agreements.[6] Jai–Mai and its predeces-

---

6. Due to its limited flow capacity, we believe that it would be difficult to characterize Jai–

sors retained control over the recipients of its service via these agreements.[7]

Admittedly, Jai–Mai did send a letter to the Township dated December 16, 2002, advising the Township of its belief that it had enough capacity to potentially provide service to a planned residential development in the area. However, as was the case in *Bethlehem Steel Corporation,* we agree with the PUC that this letter did not constitute Jai–Mai holding itself out as a public utility. Rather, this letter amounted to nothing more than a business discussion/negotiation. Furthermore, this letter was not sent to the project developer; it was sent to the Township, which was considering whether it should extend public sewer service to the area. Hence, it is questionable whether this letter can even be considered a solicitation or a proposal.

Based upon our review of the evidence of record, we cannot say that the PUC's conclusions that Jai–Mai was not a public utility and that Jai–Mai only provided services to a defined, privileged and limited group were not supported by substantial evidence.

 Next, Petitioner alleges that the PUC erred and/or abused its discretion by concluding that Jai–Mai was not a public utility on the one hand and on the other hand directing Jai–Mai to notify the PUC of its intent to service any additional customers. We see no error on the part of the PUC in this regard.

Initially, we note our agreement with the argument of the PUC in its brief to this Court that Petitioner lacks the standing necessary to challenge the condition placed upon Jai–Mai in its order. This condition applies strictly to Jai–Mai and bears no relationship to Petitioner. Even assuming that Petitioner did have standing, we believe that said condition was not in error nor was it an abuse of discretion as it was extremely relevant to the present case where service to one or more new customers could affect the legal foundation upon which the PUC based its present determination that Jai–Mai was not a public utility.

Accordingly, the order of the PUC is affirmed.[8]

Judge Smith-Ribner dissents.

## *O R D E R*

AND NOW, this 17th day of July, 2007, the order of the Pennsylvania Public Utility Commission is hereby affirmed.

---

Mai sewage treatment services as available to all members of the public. Instead, this limited capacity lends itself to the PUC's finding that said services were provided to a defined, privileged and limited group.

7. In other words, despite the condition attached to the NPDES permit granted to Jai–Mai and its predecessors requiring them to permit outside users, the outside user still had to agree to pay a connection fee as well as a

monthly fee representing capital costs and operation and maintenance expenses.

8. Petitioner raised an additional issue in its brief to this Court regarding the PUC's error as a matter of law in denying its exception regarding the refund of illegally collected rates. However, as we determined above that the PUC did not err in concluding that neither Jai–Mai nor its predecessors were a public utility, this issue is now moot.