**BOROUGH OF OLYPHANT,**
Petitioner

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 11, 2004.

Decided July 28, 2004.

Ordered Published Nov. 10, 2004.

John F. Woods, Annapolis, MD, for petitioner.

Robert F. Young, Harrisburg, for respondent.

David B. MacGregor, Philadelphia, for intervenor, PPL Electric Utilities Corp.

BEFORE: COHN, Judge, and SIMPSON, Judge, and MIRARCHI, JR., Senior Judge.

OPINION BY Judge COHN.

Before the Court is the Borough of Olyphant's (Borough) appeal of a declaratory order issued by the Pennsylvania Public Utility Commission (PUC). PPL Electric Utilities Corporation (PPL) had filed a Petition for Declaratory Order with the PUC, seeking to terminate controversies concerning (1) the Borough's attempt to force PPL to abandon its certificated electric service within the Mid–Valley Industrial Park (MVIP), and (2) the obligation of PPL retail customers within the certificated territory to pay competitive and intangible transition charges. The PUC issued a Declaratory Order ruling that (1) the MVIP is within PPL's certificated territory, (2) the PUC alone may require PPL to abandon its certificated service, and (3) any retail customer of PPL in the Borough must pay the transition charges. The Borough has appealed that Order to this

Court claiming that the PUC lacked jurisdiction, that there are disputed issues of fact that require a remand, and that the PUC's order contains substantive errors.

In large part, resolution of this case involves the interpretation of the Electricity Generation Customer Choice and Competition Act (Competition Act), 66 Pa.C.S. §§ 2801–2812, in the context of the extensive procedural history between the Borough and PPL.

## COMPETITION ACT

A brief overview of the Competition Act will help place this appeal in context. The General Assembly enacted the Competition Act in 1996. Prior to its enactment, electricity was provided as a single service comprised of three "bundled" components: generation, transmission and distribution. The Competition Act unbundled these components, and allows customers to choose among competing electric generation suppliers (EGSs) for the generation component. The transmission and distribution components remain natural monopolies regulated by both the Federal Energy Regulatory Commission (FERC) and the PUC.

In order to facilitate a smooth transition into electric competition, the Competition Act ordered retail customers to make additional payments to electric utility companies to compensate for "stranded costs." Stranded costs are the utilities' "known

and measurable net *generation*-related costs ... which traditionally would have been recoverable under a regulated environment but which may not be recoverable in a competitive electric generation market ..." 66 Pa.C.S. § 2803 (emphasis added). To offset PUC-approved stranded costs, utilities may charge both Competitive Transition Charges (CTCs) and Intangible Transition Charges (ITCs).[1]

## FACTUAL BACKGROUND

The Borough has operated its own municipal electric system since 1891. However, since 1946, the Borough has obtained all of its *wholesale* electric capacity, energy and transmission service from PPL and its predecessors, pursuant to wholesale rates filed and approved by FERC. (R.R. 209–214, Borough brief at 10). PPL is a "public utility" and an "electric distribution company" (EDC) as defined under the Public Utility Code and is subject to the PUC's regulatory jurisdiction. 66 Pa.C.S. §§ 102, 1101, 1102, 2803.[2] On June 28, 1948, the PUC awarded a certificate to the Scranton Electric Company, a predecessor of PPL, granting the power, right and privilege to provide electricity service within the Borough of Olyphant to consumers whose load exceeds 100 horsepower and, with the consent of the Borough, to consumers whose load is less than 100 horsepower. Pursuant to this certificate,

---

1. CTCs are *"nonbypassable* charge[s] applied to the bill of every customer accessing the transmission or distribution network [and] which [are] designed to recover an electric utility's transition or stranded costs as determined by the commission." 66 Pa.C.S. § 2803 (emphasis added). Principles and guidelines by which the PUC shall approve these charges are found in Section 2808. *See* 66 Pa.C.S. § 2808.

   In slight contrast, ITCs are those amounts approved pursuant to a qualified rate order of

the PUC and "imposed on all customer bills and collected, through a *nonbypassable* mechanism, by the electric utility." 66 Pa.C.S. § 2812 (emphasis added). These ITC charges offset the CTCs approved by the PUC. 66 Pa.C.S. § 2808.

2. An EDC is "[t]he public utility providing facilities for the jurisdictional transmission and distribution of electricity to retail customers." 66 Pa.C.S. § 2803.

PPL has provided these services.[3]

In 1978, the Borough facilitated the development of the MVIP within the Borough limits.[4] However, the Borough was financially unable to furnish the electrical power necessary to support the MVIP. Therefore, the Borough Council passed a resolution (1978 Resolution) indicating its support for PPL to provide electricity services to customers located in the MVIP. In accordance with the 1978 Resolution, but pursuant to its certificate, PPL began and has continued to provide these services.

In accordance with the Competition Act, the PUC required PPL to divest itself of its generation facilities and transfer its electric generation to a separate corporate affiliate (an EGS). *See* Final Order, PUC Docket No. R–00973954 (August 27, 1998). However, PPL remains the provider of last resort in its certificated territory, in order to ensure the availability of electric service. 66 Pa.C.S. § 2802(16). This means that throughout the period of transition to electricity competition, PPL "shall continue to have the full obligation to serve, including the connection of customers, the delivery of electric energy and the *production or acquisition of electric energy* for customers." 66 Pa.C.S. § 2807(e) (emphasis added).

A dispute over the provision of wholesale power was resolved by a Settlement Agreement dated January 29, 1998, approved by FERC, along with a 5–year Power Supply Contract.[5] The text of the Settlement Agreement provides that "[PPL] will not seek any stranded cost recovery or exit fee against any of the Parties to this Settlement Agreement, and hereby waives any present or future rights to any such claims." (Borough of Lansdale, et al., Settlement Agreement, FERC Docket No. SC97–1–000, Article 2.6 (January 29, 1998)). The Power Supply Contract incorporates, by reference, all terms of the Settlement Agreement and provides that it is for the Borough's "firm power requirements (capacity and energy)." (Article V, R.R. 252).

One source of the instant controversy is Section 2805(b) of the Competition Act which permits a borough to prohibit EGSs from serving end-use customers within the borough limits, if the borough wants to do so, as long as the borough does not provide service outside of borough limits. 66 Pa. C.S. § 2805(b). Relying upon that Section, in December 1997, the Borough passed a Resolution (1997 Resolution) declaring that it was in Olyphant's interest "to be the exclusive electric supplier within the Borough Limits of the Borough of Olyphant" and resolving "to prohibit electrical generation suppliers from serving end-use customers within the Borough [l]imits." (R.R. 40).

In March 2001, the Borough sent a letter to WEA Manufacturing, PPL's largest customer in the MVIP (WEA Letter). In that letter, the Borough cited Section 2805(b) in support of the Borough's exclusive right to serve customers within the Borough, and the 1997 Resolution as indication of its intent to do so. Referring to

---

**3.** The Borough has provided a lengthy history detailing the relationship between PPL and the Borough, as well as the reasons underlying its support for PPL's certificate and range of services. This Court is not unmindful of this relationship. However, we will limit our discussion to those facts relevant to the issues before us.

**4.** The MVIP is located primarily within Borough limits. However, a portion is located with the Borough of Jessup. (R.R. 59).

**5.** This dispute involved whether, and under what conditions, the Borough and other boroughs in Pennsylvania would be liable for wholesale stranded costs. *See generally* FERC Docket No. SC97–1–000.

the terms of the Settlement Agreement, the Borough asserted that if the MVIP customers, including WEA Manufacturing, received electric service from the Borough, they would not have to pay PUC-approved transition charges to PPL. (R.R. 47).[6]

In a letter to PPL on April 25, 2001, the Borough advised PPL of its intention to serve customers within the MVIP. Further, the Borough indicated its understanding that PPL service within the MVIP is pursuant to the 1978 Resolution and asserted its right to change the 1978 Resolution at any time. Finally, the Borough offered to negotiate a transition period during which the Borough would replace the existing distribution infrastructure with one supplied by the Borough.[7]

PPL then filed its Petition requesting a Declaratory Order with the PUC in October, 2002. There ensued a complex procedural history, marked by delays, a change in venue and non-conformity to administrative, procedural regulations. After receiving an Extension of Time to Answer PPL's Petition from the PUC, the Borough failed to submit an Answer. Rather, the Borough filed a Notice of Removal in United States District Court for the Middle District of Pennsylvania, purporting to remove PPL's Petition from the PUC to the Middle District. Upon receipt of the Notice of Removal, the PUC stayed all actions in the matter before it. In June 2003, the Middle District granted PPL's Motion to Strike Notice of Removal, and the PUC regained jurisdiction over the Petition. *Borough of Olyphant v. Pennsylvania Power & Light Company*, 269 F.Supp.2d 601 (M.D.Pa.2003). The Borough did not appeal the Middle District's order, but, again, the Borough failed to submit an Answer. Rather, on August 11, 2003, the Borough filed a Petition to Intervene and Motion to Deny the Petition. Nevertheless, the PUC treated these petitions as the Borough's Answer. On December 18, 2003, the PUC issued the Declaratory Order which is the subject of this appeal.[8]

## DISCUSSION

The Borough asserts the same arguments before this Court as it asserted before the PUC:[9] 1) whether the PUC properly had jurisdiction over this matter; 2) whether there are disputed issues of

---

**6.** The record includes an undated letter, to an unidentified business owner, from the Borough that echoes the assertions contained in the WEA Letter (Undated Letter). (R.R. 45).

**7.** The Borough has indicated that none of its current customers is connected to PPL's distribution system and transmission services are based upon the PJM Open Access Transmission Tariff.

**8.** In addition to this case, there is an extensive history of litigation between PPL and the Borough of which the PUC took notice, but, contrary to the Borough's perspective, did not find relevant. (*See* PUC Order; PUC Brief). For example, the Borough filed a complaint in U.S. District Court for the Middle District of Pennsylvania against PPL for violation of federal antitrust laws and breach of contract.

This case was subsequently transferred to the Eastern District of Pennsylvania. Most recently, the Eastern District granted PPL's motion for summary judgment. *Borough of Olyphant v. PP & L, Inc. et al.*, 2004 WL 1091037 (E.D.Pa.2004).

In 2002, PPL obtained a declaratory order from the FERC regarding the scope of the 1998 Settlement Agreement, in which the FERC found that PPL's entitlement to recover *retail* stranded costs from *retail* customers is *not* addressed by the Settlement Agreement, and recognized that the PUC has exclusive jurisdiction over retail stranded costs. (Order, PPL Electric Utilities Corporation, 101 FERC ¶ 61, 370 (December 26, 2002)).

**9.** The Borough listed ten issues in its brief; however, they fall into three major headings and that is how we will address them.

material fact that require a remand for an evidentiary hearing; and 3) whether the PUC Order contains substantive errors.

## 1. The Jurisdiction of the PUC

■ The Borough challenges PUC jurisdiction on dual grounds.[10] First, the Borough argues there was no controversy sufficient for the PUC to address in its Declaratory Order. Second, the Borough contends that the PUC has addressed matters exclusively within federal jurisdiction.

### a. Existence of a Controversy

■ The PUC may issue declaratory orders, where, as here, there is controversy or uncertainty.[11] By statute and through official correspondence, the Borough has asserted that it can prevent PPL from providing electricity service within the borough limits, particularly in the MVIP. Further, it has asserted that former PPL customers are not responsible for paying stranded costs. *See* 1997 Resolution at R.R. 289; the Undated Letter at R.R. 45; the WEA Letter at R.R. 47.

The Borough argues that, because the PUC did not address or attempt to resolve disputes of fact, there was no controversy or uncertainty (as per § 331(f)) upon which to issue a declaratory order and, thus, the PUC's order was an advisory opinion.[12]

*Aetna Life v. Haworth,* 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). However, there is no dispute as to those facts giving rise to this controversy. The Borough does not dispute that it passed the 1997 Resolution, nor does it dispute the contents of its official correspondence with customers located within the MVIP. These undisputed facts created a "definite and concrete" controversy, "touching the legal relations of parties having adverse legal interests." *Id.* at 240–241, 57 S.Ct. 461. The PUC Declaratory Order addresses those questions raised by the controversy and provides "specific relief through a decree of a conclusive character [rather than] an opinion advising what the law would be upon a hypothetical state of facts." *Id.* at 241, 57 S.Ct. 461.

The Borough also argues that its actions merely evidenced a desire to compete with PPL for customers in the MVIP and that it took no steps to actually exclude PPL from its certificated territory. *See* Borough Brief at 36–38. This argument does not convince the Court. The Declaratory Order does not anticipate "events which may never occur." *Independence Blue Cross v. Pennsylvania Insurance Dept.,* 802 A.2d 715, 719 (Pa.Cmwlth.2002). The Borough's assertions, by statute and through official correspondence, present antagonistic claims that would inevitably

---

**10.** Jurisdiction is a threshold question, subject to plenary review. *Bethlehem Steel Corp. v. Pennsylvania Public Utility Commission,* 680 A.2d 1203 (Pa.Cmwlth.1996), *reversed on other grounds,* 552 Pa. 134, 713 A.2d 1110 (1998).

**11.** Section 331(f) provides that "[t]he commission, with like effect as in the case of other orders, and in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty." 66 Pa.C.S. § 331(f).

**12.** The facts which it believes are disputed are: the Borough never granted an exclusive

franchise to PPL; the Borough has the right to serve all customers in the Borough; the 1997 Resolution exercised this right; the Settlement Agreement with PPL precludes any stranded cost recovery (Settlement Agreement, Art. 2.6.); the Borough serves customers only by connecting them to its own distribution system and no Borough customers are connected to the PPL distribution system; the transmission service is PJM (Open Access Transmission) and, therefore, under the Power Agreement, Art. 6(a) and the Settlement Agreement, Art. 3.4, customers may leave the PPL distribution system and not pay any retail stranded costs.

lead to litigation. *Id.* Accordingly, the PUC entertained the Petition from PPL and properly issued a Declaratory Order.

### b. Lack of Federal Jurisdiction

As to those legal relations and interests addressed in the PUC Declaratory Order, they consist entirely of state law matters. There are two aspects to the controversy presented: (1) the Borough's attempt to force PPL to abandon its certificated electric service within the MVIP, and (2) the obligation of PPL retail customers within the certificated territory to pay CTCs and ITCs.

The former is clearly within the PUC's exclusive jurisdiction. Sections 1101 and 1102 of the Public Utility Code provide the PUC with the authority to grant certificates of public convenience relating to the establishment and abandonment of service. 66 Pa.C.S. §§ 1101–1102. The authority to address disputes relating to certificates is vested in the PUC. *Borough of Lansdale v. Philadelphia Electric Company,* 403 Pa. 647, 170 A.2d 565 (1961) (stating that PUC has initial jurisdiction in matters concerning relationships between public utilities and the public); *Borough of Grove City v. Pennsylvania Public Utility Commission,* 95 Pa.Cmwlth. 188, 505 A.2d 346 (1986) (holding that only PUC may alter the extent of a utility's certificated territory). The Borough does not dispute this.[13] Therefore, this aspect of the controversy was properly before the PUC.

■ As to the latter, the Borough argues that questions regarding the imposition of competitive and intangible transition charges upon former customers of PPL are outside the PUC's jurisdiction, because, pursuant to the Settlement Agreement and the Power Supply Con-

tract (collectively, Federal Agreements), such questions are properly addressed by the FERC. This argument blurs an important distinction between wholesale and retail stranded costs. Wholesale stranded costs are those incurred by a utility in providing nondiscriminatory open access transmission service to electricity suppliers seeking to compete with the utility for wholesale power sales to municipal, cooperative and investor-owned utilities. *See Transmission Access Policy Study Group v. F.E.R.C.,* 225 F.3d 667, 682–683 (D.C.Cir.2000), *affirmed sub nom., New York v. F.E.R.C.,* 535 U.S. 1, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002). In contrast, retail stranded costs are those incurred by a utility as a result of state deregulation of electricity services which allows consumers to choose among competing EGSs. *See Indianapolis Power & Light Co. v. Pennsylvania Public Utility Commission,* 711 A.2d 1071, 1073–1074 (Pa.Cmwlth.1998).

Thus, we agree with the Borough to the extent that it argues that the FERC maintains jurisdiction over *wholesale* stranded costs and their recovery. However, the state public utility commissions maintain jurisdiction over *retail* stranded costs. *See Transmission Access Policy Study Group* at 698–727 (D.C.Cir.2000). Here, the Petition PPL filed requested that the PUC address the obligation of PPL *retail* customers within its certificated territory to pay competitive and intangible transition charges. (PPL Petition at 1; R.R. at 2.) Specifically, PPL petitioned the PUC to find that:

> (2) [A]ny *retail* customer of PPL in [the Borough] must continue to pay intangible transition charges previously imposed by this Commission during the

---

**13.** Although the Borough has asserted that the PUC's interpretation of the 1948 Certificate and the Competition Act is incorrect, it does not dispute that the PUC has authority to render the interpretation. *See* Borough Brief, pp. 6–10, 33–38.

period in which transition charges are being collected, even if such customer were, in the future, to receive electric service from [the Borough] instead of PPL; and (3) any *retail* customer of PPL in [the Borough] has a similar obligation to pay competitive transition charges, even if such customer were to receive electric service from [the Borough].

*Id.* (emphasis added).

The PUC limited its discussion and the terms of its Order to *retail* stranded costs. *See* PUC Declaratory Order at 9–14; R.R. at 178–183. The argument from the Borough regarding the effect of the Federal Agreements upon the obligations of PPL retail customers is without merit. The Federal Agreements do not address retail stranded costs (either intangible or competitive transition costs). Rather, it is Pennsylvania's Competition Act that controls the obligation of retail customers to pay retail transition charges to offset stranded costs. Indeed, as the Federal Agreements originate under the authority of the FERC, they *cannot* address retail stranded costs or they would improperly encroach upon a matter exclusively within the PUC's jurisdiction. *Transmission Access Policy Study Group.*

Similarly, the Borough's argument that the PUC Order improperly modifies the terms of the Federal Agreements does not convince the Court. The Borough has repeatedly argued that the PUC Order violates the so-called *Mobile–Sierra* doctrine, which provides that the FERC may not alter the terms of a contract between a supplier and a distributor without first finding the terms "unjust, unreasonable,

unduly discriminatory or preferential." *Federal Power Commission v. Sierra Pacific Power Company*, 350 U.S. 348, 353, 76 S.Ct. 368, 100 L.Ed. 388 (1956).

However, this doctrine applies to *federal* regulatory issues. The PPL Petition and the PUC Declaratory Order do not raise any federal questions. *See, e.g., Borough of Olyphant v. Pennsylvania Power & Light Company*, 269 F.Supp.2d 601 (M.D.Pa.2003) (observing that the PPL petition raises issues that do not implicate federal jurisdiction). In particular, the PUC Order does not alter the terms of either the Settlement Agreement or the Power Supply Contract, both of which originate under the authority of the FERC. Therefore, the doctrine is not relevant here.

Finally, the Borough argues that the PUC lacks jurisdiction because there is exclusive federal jurisdiction over anti-trust issues. Although we agree with the Borough that anti-trust issues are subject exclusively to federal jurisdiction, *see Otter Tail Power Company v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), there are no anti-trust issues relevant to the Petition, nor did the PUC address such issues in its Declaratory Order. Therefore, this controversy is properly and exclusively within the PUC's jurisdiction

### 2. The Necessity for a Remand[14]

■ The Borough argues that if the PUC does have jurisdiction, we must remand for an evidentiary hearing. According to the Borough, the PUC is altering the terms of the Federal Agreements; and, the Borough asserts that it must con-

---

**14.** In reviewing a PUC decision, the Court must affirm unless there is a violation of constitutional rights, it is not in accordance with law, Commonwealth agency practice or procedural violation or the facts are not sup- ported by substantial evidence. 2 Pa.C.S. § 704; *Dee–Dee Cab, Inc. v. Pennsylvania Public Utility Commission*, 817 A.2d 593 (Pa. Cmwlth.2003), *petition for allowance of appeal denied*, 575 Pa. 698, 836 A.2d 123 (2003).

duct a hearing before altering a contract under Section 508 of the Public Utility Code, 66 Pa.C.S. § 508.[15] Furthermore, the Borough strenuously argues that there are disputed issues of fact.[16] Thus, the Borough claims that the PUC has violated state administrative procedures and Constitutional due process in not conducting an evidentiary hearing.

In contrast, the PUC argues that an evidentiary hearing is not necessary because there are no material facts in dispute and because the Code does not mandate evidentiary hearings for declaratory order petitions. 66 Pa.C.S. § 331(f). Evidentiary hearings are only necessary when there are material facts in dispute—not for disputes of law, policy, or discretion. *Dee–Dee Cab*, 817 A.2d 593 (Pa.Cmwlth.2003). Therefore, according to the PUC, there was no procedural or due process violation.

As we have already discussed, the PUC did not modify any contract and there are no material facts in dispute. Any reference to stranded costs in the Federal Agreements applies only to those costs valid under federal law—that is, wholesale, not retail stranded costs. The Federal Agreements remain intact. Therefore, Section 508, in that it requires a hearing before a contract may be modified, is not relevant to this case. Further, there are no disputed issues of material fact here; instead, those issues the Borough sets forth are fundamentally legal issues.[17] Accordingly, this Court holds that the PUC has satisfied the Borough's due process

rights and there is no need for an evidentiary hearing.

### 3. The Substance of the PUC Declaratory Order

The Borough argues that the PUC erred in determining that (a) the MVIP is within PPL's certificated territory and only the PUC may force a certificated utility to abandon its territory; and (b) the Competition Act requires retail customers who switch to the Borough to continue to pay stranded costs.

#### a. Interpretation of the Certificate

■ First, the Borough argues that, based upon its interpretation of its ordinances and the certificate of public convenience, the MVIP is not within PPL's certificated area, and that, under the Competition Act, it can prevent PPL from providing service in the Borough. Section 2805 provides in relevant part that, "[a] borough may prohibit *electric generation suppliers* from serving end-use customers within its borough limits." 66 Pa.C.S. § 2805(b)(1) (emphasis added). The Borough maintains that even though PPL is not an EGS (electric generation supplier) but an EDC (electric distribution company), that the statute applies anyway. As support, it cites *PPL Energyplus, LLC v. Commonwealth*, 800 A.2d 360 (Pa.Cmwlth. 2002), which held that an EGS is a public utility for limited purposes provided in Sections 2809 and 2810. Thus, according

---

**15.** This Section provides in relevant part:

> The commission shall have power and authority to vary ... any obligations, terms, or conditions of any contract ... between any public utility and any ... municipal corporation ... [w]henever the commission shall determine, after reasonable notice and hearing ... that any such obligations, terms, or conditions are unjust, unreason-

able, inequitable, or otherwise contrary or adverse to the public interest....
66 Pa.C.S. § 508.

**16.** *See* fn. 10.

**17.** The interpretation of the terms of the Certificate of Public Convenience, the Federal Agreements and the Competition Act are all issues of law, not fact.

to the Borough, there is no requirement that the PUC provide authorization.

The PUC contends that the MVIP is within PPL's certificated area and that the Borough's reliance on Section 2805(b) is misplaced. Instead, it relies on Section 1102(a)(2) and the Court's ruling in *Grove City* to conclude that the PUC alone, not the Borough unilaterally, can authorize an abandonment of service. Section 1102 provides that a certificated utility may only abandon service to a customer if approved by the PUC, unless the abandonment relates to nonpayment of a bill or customer request. 66 Pa.C.S. § 1102. In *Grove City*, the Court stated that, "[t]he extent of a utility's service territory may be altered only by order of the PUC." *Grove City*, 505 A.2d at 354. Finally, the PUC notes that PPL is providing service within Borough limits as an EDC.

We hold that the PUC's conclusion that the MVIP is located within PPL's certificated area is the correct interpretation of PPL's Certificate. The Certificate authorizes PPL to provide electricity service within the Borough to consumers "whose load requirements exceed 100 [horsepower]," and with the consent of the said borough, to consumers "whose load requirements are less than 100 [horsepower]." (Certificate of Public Convenience, Scranton, June 28, 1948, at R.R. 37.) The industrial park is located within the Borough; therefore, the MVIP is located within PPL's certificated area. Based upon these undisputed facts, the PUC correctly interpreted PPL's Certificate of Public Convenience.[18]

Furthermore, the Borough's assertion that it can unilaterally force PPL to aban-

don its certificated territory is incorrect under the law. Section 2805(b) explicitly refers to a borough's ability to prohibit an *EGS* from serving customers within its borough limits, but does not indicate a similar ability with respect to an *EDC*. Thus, the Borough's reliance on Section 2805 is inappropriate here and, accordingly, the PUC is correct in this regard.

### b. Interpretation of the Competition Act

■ Second, the Borough argues that the Competition Act does not require PPL retail customers who switch to the Borough's service to continue to pay transition charges. As support, the Borough offers the statutory definition of a CTC (competitive transition charge). In particular, the Borough notes that CTCs apply to "every customer accessing the transmission or distribution network." 66 Pa.C.S. § 2803. The Borough argues that, because customers who switch to it for electricity services will connect to the Borough's own distribution system and rely on the PJM transmission service, these customers do not satisfy the statutory definition.

The PUC counters that PPL is authorized to collect non-bypassable CTCs and ITCs (intangible transition charges) from every PPL retail customer located within its certificated territory, pursuant to 66 Pa.C.S. § 2808 (relating to the imposition of CTCs), § 2812 (relating to the imposition of ITCs), Commission Final Order of August 27, 1998 at Docket No. R–00973954 (approving the settlement of PPL's restructuring plan) and the May 21, 1999 Supplemental Order to the Final Order (addressing the collection of ITCs). This authority clearly applies to all PPL retail

---

18. The Borough argues that it was only because it could not provide electricity to the MVIP that it "authorized" PPL to do so and, therefore, now that it can provide the service, the authorization is not effective. However,

the authority PPL has to provide electrical service is set forth in its Certificate of Public Convenience issued by the PUC, not by ordinance.

customers located within the industrial park.

The Borough correctly notes that CTCs apply to "every customer accessing the transmission or distribution network." 66 Pa.C.S. § 2803. However, it must also consider the statutory definition of "transition or stranded costs." These costs are "[a]n electric utility's known and measurable net electric *generation*-related costs." 66 Pa.C.S. § 2803 (emphasis added). The transmission or distribution system that a customer relies upon is irrelevant.[19] This applies to both CTCs and ITCs. The PUC correctly interprets the Competition Act to require every retail customer of PPL, located within the Borough, to pay transition charges to PPL throughout the transition period, as long as that customer remains within this certificated territory. This includes those retail customers of PPL who may switch to the Borough for their electricity service. Thus, the Borough cannot prevail on this issue either.

Because we conclude that the PUC did not act beyond its jurisdictional power, appropriately entered a declaratory judgment and committed no errors of law, we affirm its order.

### ORDER

**NOW,** July 28, 2004, the order of the Pennsylvania Public Utility Commission in the above-captioned matter is hereby affirmed.

---

**19.** The Court notes that Section 2803 refers to *"the* transmission or distribution network" and not *"the utility's* transmission or distribu- tion network." 66 Pa.C.S. § 2803 (emphasis added).