983 A.2d 641

**SPECTRUM ARENA LIMITED PARTNERSHIP, Appellant**

**v.**

**COMMONWEALTH of Pennsylvania, Appellee.**

Supreme Court of Pennsylvania.

Argued May 13, 2009.

Decided Nov. 5, 2009.

182

Michael J. Semes, Esq., William H. Roberts, Esq., Robert P. Harrill, Jr., Esq. and Geoffrey C. Lord, Esq., Blank Rome L.L.P., Philadelphia, for Spectrum Arena Limited Partnership.

John Bartley Delone, Esq., Carol L. Weitzel, Esq., Clinton G. Smith, Esq., for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD, McCAFFERY and GREENSPAN, JJ.

## *OPINION*

Justice GREENSPAN.

We evaluate the Tax Reform Code of 1971, 72 P.S. §§ 7101–10004 (the "Tax Code"), to determine whether delivery services and costs associated with the consumption of electricity by Appellant Spectrum Arena Limited Partnership ("Spectrum") are subject to Pennsylvania sales tax pursuant to the Tax Code. We hold that the aforementioned services and costs

are subject to sales tax. We therefore affirm the order of the Commonwealth Court denying Spectrum's request for a refund of sales taxes.

## BACKGROUND

Spectrum owns and operates a sports and entertainment facility known as the Wachovia Center Complex in Philadelphia, Pennsylvania (the "Wachovia Center"). From April 11, 2000 through May 1, 2003 (the "Refund Period") Spectrum used a significant amount of electricity to heat, cool, and light the Wachovia Center. During the Refund Period and until May 29, 2003, the electricity for the Wachovia Center was generated by Exelon Energy ("Exelon") and delivered by PECO Energy Company ("PECO").[1] During the Refund Period PECO charged Spectrum for electricity generation, transmission services, distribution services, competitive transition charges ("CT Charges"), and intangible transition charges ("IT Charges"). Spectrum was charged and paid state and local sales tax on all of the aforementioned charges.

However, Spectrum disputed its obligation to pay sales tax on the transmission services, distribution services, CT Charges, and IT Charges (collectively the "Disputed Charges"). On April 11, 2003, Spectrum filed with the Department of Revenue Board of Appeals (the "Board") a petition for a refund of sales tax paid on the Disputed Charges during the Refund Period. In its petition, Spectrum argued that non-generation costs did not constitute a taxable sale of tangible personal property or a specifically enumerated taxable service as defined by the Tax Code.

1. As is discussed in greater detail herein, Spectrum shopped competitively among electricity companies and selected Exelon to generate energy for the Wachovia Center. Because the Wachovia Center is located in an area serviced by PECO as its local utility, Exelon does not own the necessary infrastructure needed to transmit the energy directly to Spectrum. Instead, Exelon generated the energy and transmitted that energy to PECO. PECO then transmitted that energy, as well as any surplus energy required by Spectrum, to the Wachovia Center *via* the electric lines and other infrastructure owned by PECO.

The Board denied Spectrum's petition and found that the Disputed Charges were part of the "sale of electricity" and therefore subject to sales tax. As a basis for this finding, the Board relied on a Department of Revenue Policy Statement (the "Policy Statement") contained in Section 60.23 of the Pennsylvania Administrative Code. Pursuant to the Policy Statement, sales tax is to be assessed:

> upon the total purchase price charged upon each separate charge for the generation, transmission, or distribution in connection with providing nonresidential electric utility services as well as all related charges, services or costs for the generation, production, transmission, or distribution of electricity whether or not the total amount charged is billed as a single charge by one vendor or billed separately by one or more vendors.

61 Pa.Code § 60.23(d). Based in part upon the Policy Statement, the Board found that Spectrum was not entitled to a sales tax refund. Spectrum appealed to the Board of Finance and Review and was again denied relief.

Spectrum filed a timely appeal with the Commonwealth Court. On April 18, 2007, the Commonwealth Court issued an *en banc* Opinion and Order affirming the Board's decision. *Spectrum Arena Ltd. P'ship v. Commonwealth*, 921 A.2d 585 (Pa.Cmwlth.2007) ("*Spectrum I* "). After an in-depth review of both the Tax Code and the Electricity Generation Consumer Choice and Competition Act, 66 Pa.C.S. §§ 2801–2812 (the "Competition Act"), the Commonwealth Court concluded that the Disputed Charges were properly included in the taxable portion of the purchase price of electricity. *Spectrum I*, 921 A.2d at 590–91. The Commonwealth Court therefore held that the sales tax was appropriately assessed and that Spectrum was not entitled to a refund. *Id.* at 591.

Spectrum timely filed exceptions to the Commonwealth Court's April 18, 2007 Opinion and Order. In its exceptions Spectrum argued, *inter alia*, that an exemption in the Tax Code applied to the Disputed Charges. Specifically, Spectrum argued that Section 54.1(c) of the Pennsylvania Administrative Code exempts from taxation the delivery cost of a product

delivered by a party other than the vendor supplying the product. 61 Pa.Code § 54.1. Spectrum reasoned that because the Disputed Charges related to delivery services provided by PECO to deliver electricity generated by Exelon, the Disputed Charges therefore met the exemption set forth in Section 54.1(c).

On April 30, 2008, in a second *en banc* Opinion and Order, the Commonwealth Court denied Spectrum's exceptions. *Spectrum Arena Ltd. P'ship v. Commonwealth,* 951 A.2d 1226 (Pa.Cmwlth.2008) *("Spectrum II ").* The Commonwealth Court declined to view PECO as the mere delivery conduit of a product created by Exelon. Instead, the Commonwealth Court noted that both generation and delivery of electricity were fundamental parts of providing electricity to the consumer. *Id.* at 1229. The Commonwealth Court therefore interpreted the generation and delivery of electricity as a seamless transaction accomplished by two entities working in concert. *Id.* Under this view of the transaction, the Commonwealth Court held that the sales tax exemption set forth in Section 54.1(c) was inapplicable to the Disputed Charges. *Id.* at 1229.

Spectrum timely appealed the Commonwealth Court's April 30, 2008 Opinion and Order to this Court.[2] On appeal, Spectrum raises the following four issues:[3]

(1) Whether, in holding that Appellant is not entitled to a refund of sales tax it paid on electric transmission and distribution-i.e., delivery-charges, the en banc Commonwealth Court 5–2 majority erred as the dissent noted, because it "ignored" the impact of the Competition Act, which unbundled the delivery services from the sale of electricity, and improperly upheld the taxation of such charges by rebundling them with the sale of electricity as though the purchase of electricity remained the same "seamless transaction" it had been before the Competition Act.

2. Spectrum files the instant appeal as a matter of right from the final order of the Commonwealth Court. 42 Pa.C.S. § 723.

3. Stated *verbatim* from Spectrum's brief in support of its appeal.

(2) Whether the majority misapprehended the stipulated facts that Appellant's purchase of electricity complied with the only two requirements necessary to exempt "delivery charges" from sales tax under the Department of Revenue's Delivery Charge regulation, 61 Pa.Code § 54.1, and then misapplied and effectively rewrote § 54.1 to add further requirements for exemption, and thus failed to adhere to the plain language of the regulation, which provides that separate charges for delivery by a person other than the vendor are not subject to sales tax.

(3) Whether the majority erred in its sales tax ruling, which creates an indefensible anomaly, upholding the imposition of sales tax upon post-deregulation electric delivery services, while permitting the Department of Revenue's inconsistent exemption of post-deregulation natural gas delivery services from sales tax that the Dissent noted produces "disparate treatments of similar industries, by means of similar statutory language" that are "inexplicable."

(4) Whether the majority erred in holding that a utility consumer must pay sales tax on the statutory Transition Charges as part of the "purchase price" of electricity, even though the Competition Act explicitly defined the Transition Charges as separate from the purchase of electricity and consumers are required to pay the Transition Charges regardless of whether they purchase electricity or not.

Spectrum's first and fourth issues are interrelated and are discussed together herein. To resolve these two issues, we must determine whether the legislative "unbundling" of generation and delivery of electricity was sufficient to render the Disputed Charges separate from any generation costs such that the Disputed Charges are not taxable. To resolve the second issue, we must determine whether the Disputed Charges meet the sales tax exemption set forth in Section 54.1 of the Pennsylvania Administrative Code. To resolve the third issue, we must determine whether it is permissible for different taxation schemes to apply with regard to the taxation of electricity and natural gas.

## ANALYSIS

To understand the issues in this appeal a brief review of the history of the sale and regulation of electric utilities in Pennsylvania is instructive. Historically, electric utilities generated electricity and distributed that electricity directly to consumers. *Lloyd v. Pennsylvania Utils. Comm'n,* 904 A.2d 1010, 1013 (Pa.Cmwlth.2006). Each utility had a specific service area and the "local" utility serviced all consumers within that service area. Each utility "bundled" the costs associated with the generation and distribution of electricity and presented the consumer with a single amalgamated cost for the amount of electricity provided. *Indianapolis Power & Light Co. v. Pennsylvania Utils. Comm'n,* 711 A.2d 1071, 1073 (Pa. Cmwlth.1998); *ARIPPA v. Pennsylvania Utils. Comm'n,* 792 A.2d 636, 642 (Pa.Cmwlth.2002). Due to the bundled nature of the services, the entire cost of generation, transmission, and distribution was subject to sales tax. *Spectrum I,* 921 A.2d at 586. Consumers could not "unbundle" services so as to utilize two different utilities for the generation and delivery of electricity. *Borough of Olyphant v. Pennsylvania Utils. Comm'n,* 861 A.2d 377, 379 (Pa.Cmwlth.2004).

In 1996, the Competition Act was passed to encourage a more competitive marketplace for electricity sales. *PECO Energy Co. v. Commonwealth,* 591 Pa. 405, 919 A.2d 188, 188–89 (2007); *see also Lloyd,* 904 A.2d at 1013 (stating "Electric deregulation broke up the utility's monopoly over the providing of electricity"). Pursuant to the Competition Act, a consumer could purchase electricity from any utility and have that electricity delivered by the local utility in the purchaser's area. 66 Pa.C.S. § 2802(16); *PP & L Indus. Consumer Alliance v. Pennsylvania Utils. Comm'n,* 780 A.2d 773, 775 (Pa.Cmwlth.2001). Regardless of where the electricity was generated, each consumer was obligated to pay the "stranded costs," including CT Charges and IT Charges, for the local utility who delivered the electricity. 66 Pa.C.S. § 2808(a); *Lloyd,* 904 A.2d at 1014; *Borough of Olyphant,* 861 A.2d at 379.

The passage of the Competition Act also modified the Tax Code in several ways. Prior to the passage of the Competition Act, the Tax Code defined taxable "sales of electric electricity" to include charges relating to transmission, distribution, CT Charges, and IT Charges. *Spectrum I*, 921 A.2d at 587. The Competition Act modified the definition of a "sale" of electricity found in Section 1101(b) of the Public Utilities Code to include:

[r]etail sales of electric generation, transmission, distribution or supply of electric electricity, dispatching services, consumer services, competitive transition charges, intangible transition charges and universal service and electricity conservation charges and such other retail sales in this Commonwealth.

*Id.* (citing 66 Pa.C.S. § 2810(j)). As modified, the Tax Code still defines electricity for non-residential use as tangible personal property and the definition of a "sale at retail" remains unchanged. 72 P.S. § 7201(m). The Tax Code modification did not expressly remove electricity delivery charges from the definition of a "sale."

In an effort to ensure that electricity deregulation did not adversely affect overall tax revenues, when the General Assembly passed the Competition Act, the General Assembly also adopted the revenue-neutral reconciliation ("RNR") formula to recoup any losses caused by the restructuring of the electric industry. As the Commonwealth Court explained:

The RNR formula operates according to an annual comparison of the total amount of taxes collected in five separate tax types from electric utilities in the base fiscal year beginning on July 1, 1995, and ending on June 30, 1996, to the total amount of taxes collected from the five categories by utilities in the years after deregulation. In the formula's application, when the amount of taxes collected in a year following deregulation falls short of that amount collected in the base fiscal year, the formula compensates for the loss by increasing the Utilities Gross Receipts Tax ("UGRT") rate in the following year. Conversely, if taxes collected in

subsequent years exceed the amount of the base fiscal year, the UGRT rate is reduced.

*Spectrum I*, 921 A.2d at 587–88. By utilizing the RNR formula, the General Assembly ensured that the Commonwealth could collect the same level of revenue that was collected prior to the passage of the Competition Act. With this understanding of the history of the Competition Act and its effect on the sale of electricity in the Commonwealth, we now address the specific issues raised by Spectrum in this case.

**Issues (1) and (4): Was the "unbundling" of generation and delivery of electricity sufficient to render the Disputed Charges separate from any generation costs such that the Disputed Charges are not taxable?**

The 1996 Competition Act unbundled electricity generation and delivery so that a consumer could "shop" among competitors for electricity generation and then have that electricity delivered by its local utility.[4] In this case, Spectrum selected Exelon to generate electricity for the Wachovia Center and PECO delivered the electricity. Prior to the effective date of the Competition Act, if Spectrum wanted to purchase electricity, Spectrum would have had no choice but to purchase electricity both generated and delivered by PECO. Clearly, as a result of the Competition Act, the manner in which Spectrum could purchase electricity changed. The crux of the instant dispute revolves around whether the change in how

4. Regardless of the origin of electricity, it must eventually pass through the power lines of a local utility to reach a consumer. Typical consumers in Pennsylvania reside or work in buildings connected to a single set of power lines that were built and are owned by that consumer's local utility. It would be cost prohibitive for other utility companies to build their own power lines to connect to each consumer. Instead, a utility that generates but does not deliver electricity, such as Exelon here, will transmit the generated electricity to the local utility. The local utility will then transmit the electricity along the power lines to the consumer. Here, the Wachovia Center was connected only to PECO's power lines. Unless Exelon built its own power lines, Exelon had to transmit electricity to PECO in order for the electricity to reach the Wachovia Center.

electricity is purchased should result in a corresponding change in the way electricity is taxed.

Spectrum's main argument is that the General Assembly, in changing the way electricity is purchased, intended a corresponding change in the way electricity is taxed. Spectrum argues that the Competition Act, by its plain language, unbundled the cost of delivery from the sale of electricity and delivery charges should therefore be exempt from sales tax. Spectrum argues that the taxable "sale" of electricity was complete when Exelon delivered the electricity to PECO and any services provided thereafter by PECO to deliver the electricity do not constitute a taxable "sale." Spectrum, in essence, equates mere generation with a completed sale. In support of its argument, Spectrum points out that other services that involve both a retail product and delivery thereof are taxed only on the product itself, and not on the delivery charges.[5]

In response, the Commonwealth argues that the unbundling provision of the Competition Act must be interpreted in light of the Competition Act as a whole and that there is no legislative intent to exempt the Disputed Charges from taxation. The Commonwealth points out that although there is now competition in the marketplace, that alone does not render an otherwise taxable portion of a sale tax-exempt. The Commonwealth notes that prior to the Competition Act, a "sale" of electricity included both generation and delivery. Because the legislature did not specifically amend the definition of a "sale" to exclude delivery, the Commonwealth argues that the definition of a "sale" remains unchanged under the Competition Act. The Commonwealth argues that the taxable "sale" of electricity to Spectrum therefore includes both the generation of electricity by Exelon and the delivery of that electricity by PECO.

5. For example, even if a cafeteria management fee is bundled into the cost for food, the management fee portion of the total cost is not taxable. *See, e.g., M & M/Mars, Inc. v. Commonwealth*, 162 Pa.Cmwlth. 375, 639 A.2d 848 (1994).

■ The dispute in this case involves a question of statutory interpretation. The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. 1 Pa.C.S. § 1921(a). When the words of a statute are clear and free from all ambiguity the statute's plain language is the best indication of legislative intent. *Penn Jersey Advance, Inc. v. Grim*, 599 Pa. 534, 962 A.2d 632, 636 (2009). Only where a statute is ambiguous will courts consider the legislative intent underpinning the language. 1 Pa.C.S. § 1921(c); *see also Malt Bevs. Distribs. Ass'n v. Pa. Liquor Control Bd.*, 974 A.2d 1144, 1149 (2009); *Pennsylvania Fin. Responsibility Assigned Claims Plan v. English*, 541 Pa. 424, 664 A.2d 84, 87 (1995) (noting that where a statute is unclear or susceptible of differing interpretations, courts must look to legislative intent). In determining legislative intent, all sections of a statute must be "read together and in conjunction with each other, and construed with reference to the entire statute." *Housing Auth. of Chester County v. Pennsylvania State Civil Service Comm'n*, 556 Pa. 621, 730 A.2d 935, 945 (1999).

■ We begin our analysis with the plain language of the Tax Code. Pursuant to the Tax Code, sales tax is imposed on a "sale at retail" on the "purchase price" of electricity. 72 P.S. § 7201. The Tax Code defines a "sale at retail" as "any transfer, for a consideration of the ownership, custody, or possession of tangible personal property, including the grant of a license to use or consume whether such transfer be absolute." Tangible personal property specifically includes electricity for non-residential use. 72 P.S. § 7201(k)(1), (m). The Tax Code defines the "purchase price" as:

the total value of anything paid or delivered, or promised to be paid or delivered, whether it be money or otherwise, in complete performance of a sale at retail or purchase at retail, as herein defined, without any deduction on account of the cost or value of the property sold, cost or value of transportation, cost or value of labor or service, interest or discount paid or allowed after the sale is consummated, any other taxes imposed by the Commonwealth of Pennsylvania

or any other expense except that there shall be excluded any gratuity or separately stated deposit charge for returnable containers.

72 P.S. § 7201(g)(1).

Here, the language of the Tax Code is clear and unambiguous. The Tax Code provides that a "retail sale" is the *"total value* of anything paid or delivered, or promised to be paid or delivered, whether it be money or otherwise, in *complete performance of a sale at retail."* 72 P.S. § 7201(g)(1) (emphasis added). The "total value" of the electricity purchased by Spectrum was not just the cost of the generation of the electricity but all the costs required for the energy to power the Wachovia Center. Spectrum's argument to the contrary is not consistent with the reality of electricity sales. The raw electricity generated by Exelon is not an end consumer product. Exelon has no practical means of delivering the electricity to Spectrum on its own. Spectrum cannot itself retrieve the electricity from Exelon. The electricity simply is not a finished product, capable of sale at retail, until it is both generated and delivered to the consumer. A sale at retail does not occur until the electricity reaches the consumer and it cannot be said to have occurred once Exelon transmits electricity to PECO. The definition of a sale at retail was applicable prior to the enactment of the Competition Act and the language of the Competition Act does not alter that definition.

The unbundling of electricity generation from electricity delivery did not exempt delivery and transmission related charges from sales tax; it merely allowed consumers the ability to choose a producer of electricity in order to negotiate better rates for the total transaction. As the Commonwealth Court aptly noted, "the overall purchase price of electricity not only includes the cost of the electricity itself, but also the cost to deliver that electricity to the consumer and other associated costs." *Spectrum I,* 921 A.2d at 589–90.

In unbundling generation and delivery, the legislature did not fundamentally alter what characterizes a "sale" of electric-

ity for the purposes of taxation. To the contrary, the legislature simply provided a means whereby two companies together could take steps to create one sale. The desire to increase competition in the marketplace changed nothing about the fundamental mechanics of the actual sale of electricity. To defeat this point, Spectrum argues that because it is obligated to pay the CT Charges and IT Charges annually regardless of whether electricity is delivered, these charges cannot possibly be part of the "sale" of electricity.[6] Spectrum's argument is incorrect. The CT Charges and IT Charges relate to the power lines and other infrastructure required to transmit electricity to the Wachovia Center. Without this infrastructure, there can be no consumer product and no "sale at retail." Although the cost for CT Charges and IT Charges may be allocated and billed differently than other charges, it is clear that these charges are a fundamental component of any sale at retail of electricity.

The same can be said of the charges arising from PECO's delivery of the electricity to the Wachovia Center once the electricity is provided to PECO by Exelon. As is discussed at length herein, the electricity is not a consumer good unless it is transmitted or delivered to the consumer along power lines. Without delivery, there can be no "sale." Therefore, although the delivery and generation may be provided by different companies, there is no "sale" unless there is both generation and delivery.

Spectrum also notes that the overall intent of the Competition Act was to reduce the cost for consumers and Spectrum concludes that the General Assembly intended to benefit consumers by excluding from taxation all non-generation related costs. As the basis for its argument, Spectrum notes that the General Assembly affirmatively amended the definition of

6. In an effort to ensure that a utility was adequately compensated for the infrastructure it installed prior to the passage of the Competition Act which ended its monopoly, the General Assembly provided in the Public Utility Code that a utility may charge customers in its local area for CT Charges and IT Charges for a period of up to nine years, even if that customer does not purchase electricity from the utility in that time period. 66 Pa.C.S. § 2808(a)-(b).

the UGRT to expressly add the Disputed Charges to the tax base. Spectrum points out that the General Assembly did not correspondingly amend the definition of a taxable "sale" under the Tax Code to include the Disputed Charges. Spectrum therefore concludes that the General Assembly did not intend for the Disputed Charges to be subject to sales tax. Spectrum's argument is flawed. No amendment to the Tax Code's definition of a "sale" was necessary because the definition of a "sale" *already* included the Disputed Charges pursuant to the definition set forth in the Public Utilities Code:

> Retail sales of electric generation, transmission, distribution or supply of electric energy, dispatching services, customer services, competitive transition charges, intangible transition charges and universal service and energy conservation charges and such other retail sales in this Commonwealth the receipts of which, if bundled, would have been deemed to be sales of electric energy prior to the effective date of this chapter shall be deemed sales of electric energy for purposes of section 1101 of the Tax Reform Code of 1971.

66 Pa.C.S. § 2810(j). There was no need for the General Assembly to modify the language of the Tax Code when the language of the Public Utilities Code clearly provided that the Disputed Charges were subject to sales tax.

Spectrum next argues that applicable case law supports a finding that the legislature intended to exempt the Disputed Charges from taxation. According to Spectrum, this Court's decision in *PECO Energy Co. v. Commonwealth, supra,* stands for the proposition that the practical effects of the Competition Act on a business cannot be ignored when interpreting the Public Utility Realty Tax Act ("PURTA"). We cannot agree with Spectrum's limited characterization of *PECO Energy Co.* and moreover the reasoning of that case suggests that the Disputed Charges are indeed subject to sales tax.

At issue in *PECO Energy Co.* was whether the term "cost" in the PURTA should be interpreted to mean "cost as shown by the books of account" or whether it should be interpreted to mean "original cost." 919 A.2d at 188–89. PECO argued

that the plain language of PURTA indicated that the appropriate definition was cost "as shown by the books of account of a public utility." *Id.* at 189. In contrast, the Commonwealth argued that "cost" actually meant "original cost." *Id.* In rejecting the Commonwealth's position, this Court noted that the plain text of PURTA defined the term "cost" as "cost shown by the books of account." *Id.* at 191–92. Because the language of PURTA was clear and unambiguous, the Court declined to read into PURTA the extrinsic definition advocated by the Commonwealth. *Id.* at 191–92.

Although the definition adopted by this Court in *PECO Energy Co.* was, as Spectrum notes, a definition consistent with the practical affects of the Competition Act, that consistency was coincidental. In actuality, the definition adopted in *PECO Energy Co.* was adopted because it was the plain meaning of the language of PURTA. Here, the plain language of the Tax Code, read in light of the Public Utilities Code, states that tax is assessed upon an electric "sale at retail." 66 Pa.C.S. § 2810(j); 72 P.S. § 7201(m). Such a definition would include the Disputed Charges. As this Court held in *PECO Energy Co.*, "[w]hen the meaning of a statute is clear, there is no reason for the court to delve into statutory interpretation rules." 919 A.2d at 191. Here, similarly, this Court cannot reject the plain meaning of the Tax Code in order to reconcile, as Spectrum requests, the pragmatics of the unbundling of the purchase of electricity with the different tax scheme set forth in the Tax Code. There is no ambiguity in the Competition Act, and the Court must apply the plain language of the Tax Code.

Here, Spectrum purchased electricity and according to the Tax Code the purchase price reflected generation, transmission, distribution and transition charges. 66 Pa.C.S. § 2810(j). Based on the plain language of the Tax Code, the Dispute Charges, although "unbundled" in the sense that they were billed by a different utility, are nonetheless part and parcel of the total purchase of electricity. Therefore the Disputed Charges are subject to sales tax under the Tax Code.

**Issue (2): Do the Disputed Charges meet the exception set forth in Section 54.1 of the Pennsylvania Administrative Code?**

 Spectrum argues that the Commonwealth Court failed to apply the plain language of Section 54.1(c) of the Pennsylvania Administrative Code, which dictates that charges for delivery are non-taxable when made or billed by a party other than the producer. 61 Pa.Code § 54.1. Spectrum argues that it is entitled to a refund because it purchased electricity from producer Exelon and delivery was made by PECO, a different entity. In response, the Commonwealth argues that the Disputed Charges are not covered by this section of the Tax Code.

The Commonwealth Court correctly determined that the tax exemption in Section 54.1(c) of the Pennsylvania Administrative Code was inapplicable to the Disputed Charges. Section 54.1(c) addresses a situation where a finished consumer good is delivered by a carrier who had no involvement in the production of the good but merely conveys the good from the producer to the consumer. Contrary to Spectrum's argument, PECO is not a mere delivery carrier. Indeed, PECO and Exelon together are the "vendor." PECO not only delivers electricity to Spectrum but would be required to generate and produce any electricity that Exelon cannot provide. 66 Pa. C.S. § 2807(e)(3). Exelon's electricity cannot be provided to a consumer if PECO does not deliver it, and a consumer, even under the Competition Act, is unable to select any entity other than its local utility as the delivering entity. There is no truly independent electricity delivery company, as is contemplated in Section 54.1 of the Pennsylvania Administrative Code. As such the Disputed Charges are subsumed within the total purchase price of the electricity which is subject to sales tax. 61 Pa.Code § 60.23(d).

**Issue (3): Is it permissible for a different taxation scheme to exist regarding the taxation of electricity and the taxation of natural gas?**

Spectrum argues that applying sales tax to the Disputed Charges for electricity when similar charges are not applied to

delivery of natural gas creates an improper disparate tax scheme. Spectrum also points out that in the context of many other goods, delivery and similar incidental charges are not taxed. *See, e.g., M & M/Mars, Inc.,* 162 Pa.Cmwlth. 375, 639 A.2d 848, 852–53 (1994) (holding cafeteria management fee is not taxable even if it is bundled with the sales price of food). Spectrum argues that the General Assembly would not have intentionally created a disparate tax scheme, and therefore that the General Assembly must have intended for electricity to be treated like natural gas and other similar goods.

■ Spectrum's position is directly undermined by the Policy Statement which specifically states that delivery charges for electricity are subject to sales tax. 61 Pa.Code § 60.23(d). The relevant portion of the Policy Statement states as follows:

Taxability of unbundled charges. To fulfill its responsibilities under Article II of the TRC, as well as[ ] the recognition of the intention of the General Assembly, as provided under the act, *the Department is required to impose Sales and Use Tax upon the total purchase price charged* upon each separate charge for the generation, transmission or distribution in connection with providing nonresidential electric utility services as well as all related charges, services or costs for the generation, production, transmission or distribution of electricity *whether or not the total amount charged is billed as a single charge by one vendor or billed separately by one or more vendors.*

*Id.* (emphasis added). There is no comparable Policy Statement regarding natural gas billing. Spectrum fails to articulate why it should not be required to pay tax on electricity delivery when the Commonwealth's Department of Revenue has specifically called for electricity delivery charges to be subject to sales tax in the clear language of the Policy Statement. Although the disparate treatment of electricity and natural gas may seem illogical to Spectrum, it apparently is the scheme intended by the legislature. It is not within this Court's power to alter this scheme and the impact of any inconsistency is more properly addressed directly to the legislature. *See Martin v. Soblotney,* 502 Pa. 418, 466 A.2d 1022,

1025 (1983) (holding that a court may not "legislate or by interpretation add to legislation, matters which the legislature saw fit not to include"); *Commonwealth v. Rieck Inv. Corp.,* 419 Pa. 52, 213 A.2d 277, 282 (1965) (stating "if the plain language of [a] statute provides no such restriction, it is not for the courts to add such a restriction but a matter for legislative action").

## *CONCLUSION*

Pursuant to the Tax Code, the Disputed Charges are subject to Pennsylvania sales tax and Spectrum is not entitled to a refund for sales tax it paid during the Refund Period. We therefore affirm the April 30, 2008 order of the Commonwealth Court denying exceptions to its opinion and order of April 18, 2007 and affirming the order of the Board of Finance and Revenue denying Spectrum's request for a refund of sales taxes.

Chief Justice CASTILLE, and Justice EAKIN and BAER, Justice TODD and Justice McCAFFERY join the opinion.

Justice SAYLOR concurs in the result.